Filed 9/20/22  In re Ashley A. CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re ASHLEY A. et al., Persons Coming Under the Juvenile Court Law. | B319230 |
| | (Los Angeles County Super. Ct. No. 19CCJP04550A-B) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. EDWIN A., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Gabriela H. Shapiro, Juvenile Court Referee.  Affirmed.

Janette Freeman Cochran, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel, and Navid Nakhjavani, Principal Deputy County Counsel, for Plaintiff and Appellant.

_____

Edwin A., the presumed father of nine-year-old Ashley A. and seven-year-old Aiden A., appeals the March 8, 2022 order terminating his parental rights pursuant to Welfare and Institutions Code section 366.26,[1] contending the juvenile court erred in ruling he had failed to establish the beneficial parental relationship exception to termination (§ 366.26, subd. (c)(1)(B)(i)). We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *The Dependency Petition and Edwin's Failed Reunification Efforts*

The family originally came to the attention of the Los Angeles County Department of Children and Family Services when Edwin arrived at a police station displaying erratic and paranoid behaviors while caring for the children. He was placed on a 72-hour hold pursuant to section 5150. Investigation by the Department uncovered additional concerns as to Edwin's mental health and his physical abuse of Ashley, as well as mental health issues and substance abuse by the children's mother, Jamie M.

On October 4, 2019 the juvenile court sustained an amended dependency petition pursuant to section 300, subdivision (b)(1), based on allegations that Edwin and Jamie had mental and emotional issues making them incapable of

---

[1] Statutory references are to this code.

2

caring for the children and placing the children at substantial risk of serious physical harm and that, in addition, Jamie had a history of substance abuse, including cocaine, methamphetamine and marijuana, which created a detrimental home environment and endangered the children's physical and emotional health. The court also sustained the amended petition pursuant to section 300, subdivisions (b)(1) and (j), based on an allegation that Edwin had inappropriately disciplined Ashley, including by striking her with a sandal, which placed both Ashley and Aiden at substantial risk of serious physical harm.

At the disposition hearing on November 20, 2019, the court declared Ashley and Aiden dependent children of the court and removed them from parental custody, placing them with their paternal uncle, Roniel P. The court ordered family reunification services for Edwin, but not Jamie. Visitation for both parents was to be monitored. Edwin was permitted a minimum of one visit per week for two hours per visit; Jamie was allowed a minimum of one visit per week for one hour per visit. Edwin and Jamie could visit the children at the same time.[2]

A combined six- and 12-month review hearing was held pursuant to section 366.21, subdivisions (e) and (f)), on

---

[2] At the November 20, 2019 disposition hearing the court found the Indian Child Welfare Act of 1978 (ICWA) (25 U.S.C. § 1901 et seq.) applied to the case in response to notice from the Citizen Potawatomi Nation that Ashley and Aiden were enrolled members of the tribe, as was their mother. The tribe appeared in the proceedings to monitor the matter on behalf of the children.

September 22, 2020.[3] During this period Edwin missed approximately half of his scheduled visits with the children. The paternal uncle reported that Edwin did not notify him in advance if he intended to cancel a visit and did not provide explanations for missing visits. Ashley and Aiden both stated they liked living with the paternal uncle and his wife, Erika G., but missed visiting with their father. The court found Edwin was in substantial compliance with his case plan and ordered that reunification services continue.

At the contested section 366.22 18-month review hearing on March 19, 2021, although the court found Edwin's progress toward alleviating or mitigating the causes necessitating placement had been substantial, it also found he was not in compliance with the case plan and terminated reunification services. The court scheduled a selection and implementation hearing pursuant to section 366.26 for July 16, 2021.

The status review report prepared by the Department indicated Edwin continued to miss visits with the children, although fewer than in the past, and stated Edwin "will make every effort to be more consistent in the future." The paternal uncle and aunt, who monitored Edwin's visits, reported Edwin had attended a majority of the scheduled visits during this review period, but added he needed prompting during the visits to meet his children's needs. In addition, the paternal uncle reported Aiden displayed concerning behaviors after visits with the children and also when Edwin cancelled visits.

_____

[3] Jamie passed away on June 12, 2020. At the September 22, 2020 hearing the court ordered grief counseling for the children.

4

A last minute information for the court filed by the Department just prior to the hearing reported that Ashley and Aiden said felt they safe under the care of the paternal uncle and aunt and, while they loved and cared for their father, they did not want to reunify with him. Ashley explained her desire to continue living with Roniel and Erika was based on her past experience when in Edwin's care, which included living in cars and having little to eat. The social worker also reported, "Ashley and Aiden hoped that if they remain long-term with the [paternal aunt] and [paternal uncle] they hope to maintain a relationship [with] the father and see him during visits."

2. *The Section 366.26 Selection and Implementation Hearing*

In the Department's initial report for the section 366.26 hearing filed July 9, 2021, the social worker stated Ashley and Aiden had developed a strong attachment to their paternal uncle and aunt with whom they had been placed since August 2019 and "have started to view them as parental figures." The report noted the uncle, aunt and children had recently moved and were now living with the paternal grandmother, which provided additional family connections. The children continued to visit with Edwin and "respond well toward the father and appear happy during their visitation." Although Edwin still canceled a few of his scheduled visits, he now communicated with the paternal uncle and aunt prior to cancelling. The paternal uncle and aunt, who wished to adopt the children, indicated they hoped to maintain ties with Edwin so that he remained in the children's lives

5

regardless of the outcome of the dependency proceedings.[4]  The Department recommended the court terminate Edwin's parental rights and place the children for adoption.

The section 366.26 hearing was continued several times and was finally held on March 8, 2022.  In its status review report for that hearing the Department stated the children had confirmed they wanted to remain with their paternal uncle and aunt but also to maintain a relationship with their father.  The Department described Edwin's visits, based on feedback from the paternal uncle and aunt as the approved monitors, as "slightly consistent" with a few cancellations.  No issues during the visits were reported.  The Department recommended adoption by the current relative caregivers as the permanent plan for the children, "as they have developed a strong foundation and routine.  Ashley and Aiden have continuously shared their request to remain there long-term."  The Department also reported the children have a strong bond with the caregivers and "view[] them as parental figures, who[m] they approach for their needs."

Edwin did not appear at the hearing on March 8, 2022.  His counsel stated she had no objection to notice but requested a continuance to allow Edwin to be present.  The court found notice proper and denied the request for a continuance.

The children's counsel joined the Department's recommendation to terminate parental rights, stating no exception to adoption applied.  Edwin's counsel objected to

_____

[4]     The uncle and aunt, however, advised the Department they did not wish to enter a post-adoption contract with Edwin regarding contact and visitation.

6

termination based on the parental relationship exception. He argued, "Father has maintained consistent visitation with the children, and the children have voiced wanting to continue to see the father. There have been no negative or concerning feedbacks regarding the visits, and it would be in the best interest of the children to continue the relationship." Counsel for the Department responded there was not sufficient evidence in the record to establish a bond under *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*) such that the children would benefit more from continuing their relationship with their father than from the permanency provided them by adoption.

After reviewing the three elements of the parental relationship exception as articulated by the Supreme Court in *Caden C.*, the court ruled Edwin had failed to establish the exception applied in this case. The court first noted Edwin's visitation might have been consistent, but it was only two to three times per month, not weekly. Edwin visited his children "not regularly enough," the court found, that the relationship between Edwin and the children would be harmed if he was not their legal parent. Moreover, the court stated, while the interaction between the children and Edwin may be positive, the children had spent the majority of their lives with the paternal uncle and aunt, and there was no evidence in the record the children's relationship with Edwin outweighed the benefit of the adoptive home, which would provide consistency and stability. In addition, the court explained, the children would not experience the loss of a significant emotional relationship with Edwin because the prospective adoptive parents were his brother and sister-in-law, who intended to continue the relationship.

The court terminated Edwin's parental rights and transferred care, custody and control of Ashley and Aiden for adopting planning and placement. The children's current caregivers, Roniel and Erika, were designated prospective adoptive parents.[5]

Edwin filed a timely notice of appeal.

## DISCUSSION

### 1. *Governing Law and Standard of Review*

The express purpose of a section 366.26 hearing is "to provide stable, permanent homes" for dependent children. (§ 366.26, subd. (b).) Once the court has decided to end parent-child reunification services, the legislative preference is for adoption. (§ 366.26, subd. (b)(1); *In re S.B.* (2009) 46 Cal.4th 529, 532 ["[i]f adoption is likely, the court is required to terminate parental rights, unless specified circumstances compel a finding that termination would be detrimental to the child"].)

Section 366.26 requires the juvenile court to conduct a two-part inquiry at the selection and implementation hearing. First, it determines whether there is clear and convincing evidence the child is likely to be adopted within a reasonable time. (*Caden C.*, *supra*, 11 Cal.5th at p. 630; *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 249-250; *In re J.W.* (2018) 26 Cal.App.5th 263, 266.) Then, if the court finds by clear and convincing evidence the child is likely to be adopted, the statute mandates judicial termination of parental rights unless the parent opposing

---

[5] The qualified expert witness report submitted by the Citizen Potawatomi Nation stated adoption by the paternal uncle and aunt constituted an ICWA-compliant kinship placement.

termination can demonstrate one of the enumerated statutory exceptions applies.  (§ 366.26, subd. (c)(1)(A) & (B); see *Caden C.*, at p. 630; *In re B.D.* (2021) 66 Cal.App.5th 1218, 1224-1225.)

One of the statutory exceptions to termination is set forth in section 366.26, subdivision (c)(1)(B)(i), which permits the court to order a permanent plan other than adoption if "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."  As the Supreme Court explained in *Caden C.*, *supra*, 11 Cal.5th 614, the exception requires the parent to establish, by a preponderance of the evidence, (1) the parent has maintained regular visitation and contact with the child, "taking into account the extent of visitation permitted"; (2) the child has a substantial, positive, emotional attachment to the parent such that the child would benefit from continuing the relationship; and (3) terminating the relationship "would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home."  (*Id.* at p. 636; see *id.* at p. 630 ["[t]he language of this exception, along with its history and place in the larger dependency scheme, show that the exception applies in situations where a child cannot be in a parent's custody but where severing the child's relationship with the parent, even when balanced against the benefits of a new adoptive home, would be harmful for the child"].)

When the benefits of a stable, adoptive, permanent home outweigh the harm the child would experience from the loss of a continued parent-child relationship, the court should order adoption.  (*Caden C.*, *supra*, 11 Cal.5th at p. 634.)  However, "'[i]f severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that,'

9

even considering the benefits of a new adoptive home, termination would 'harm[]' the child, the court should not terminate parental rights." (*Id.* at p. 633.)

We review the juvenile court's findings as to whether the parent has maintained regular visitation and contact with the child and the existence of a beneficial parental relationship for substantial evidence. (*Caden C., supra*, 11 Cal.5th at pp. 639-640; cf. *In re R.V.* (2015) 61 Cal.4th 181, 200-201 ["[t]here is, however, no single formulation of the substantial evidence test for all its applications"; where a party fails to meet its burden on an issue in the juvenile court, "the inquiry on appeal is whether the weight and character of the evidence . . . was such that the juvenile court could not reasonably reject it"].) We review the third step—whether termination of parental rights would be detrimental to the child due to the child's relationship with his or her parent—for abuse of discretion. (*Caden C.*, at p. 640.)

> 2. *The Juvenile Court Did Not Abuse Its Discretion in Concluding Edwin Failed To Establish the Parental Relationship Exception to Adoption*

As discussed, it was Edwin's burden to establish all three elements required for the parental relationship exception to apply in this case. He failed to do so.

> a. *Regular visitation and contact*

Although the juvenile court observed that Edwin's visitation had become relatively consistent by the time of the section 366.26 hearing, it had not been so for much of the dependency proceedings. For more than a year following the disposition hearing, Edwin missed nearly as many scheduled visits as he attended, and he generally provided no advance notice or after-the-fact explanation for failing to appear. Edwin

10

conceded this lack of consistency and promised the social worker he would work on the problem. While slightly better in the subsequent months, the issue of missed visits continued through the section 366.22 hearing in March 2021. Thereafter (that is, once reunification services were terminated), Edwin participated in most of the planned visits. But the court's evaluation of visitation for purposes of the parental relationship exception properly considers the entire time the children have been removed from parental custody, not simply the period immediately before the hearing at which termination of parental rights is at issue. (See *In re C.F.* (2011) 193 Cal.App.4th 549, 554 ["Sara was more consistent with visitation as the section 366.26 hearing neared, but we agree with the Agency's assessment that overall her visitation was sporadic. Sporadic visitation is insufficient to satisfy the first prong of the parent-child relationship exception to adoption"]; see also *In re J.C.* (2014) 226 Cal.App.4th 503, 531 [considering lapses in visitation that had occurred prior to the last six weeks of dependency as supporting the finding there was not regular visitation and contact].)

In addition, as the court noted, even when he stopped missing a significant number of scheduled visits, Edwin still saw the children only two or three times a month, not weekly. While Edwin is correct that weekly visitation, in the abstract, is not a requirement for the parental relationship exception to apply, the *Caden C.* Court instructed that, for purposes of proving this element of the exception, the parent's visitation must be assessed "taking into account 'the extent permitted by court orders.'" (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) Court orders in effect beginning in November 2019 allowed Edwin at least one visit per

week.  His decision to visit the children for no more than half of the time allowed by the court fully supported the court's finding Edwin failed to prove the first required element.

b.  *Beneficial relationship*

The second element of the parental relationship exception has two components:  The child has a positive emotional attachment to the parent, and the child would benefit from continuing the relationship.  (See *Caden C.*, *supra*, 11 Cal.5th at p. 636.)  Ashley's and Aiden's desire to continue to visit with Edwin, even though they did not want to reunite with him, indicated a positive relationship existed between the children and Edwin.  But the record is devoid of evidence the children would actually benefit from continuing that relationship.  (See *Caden C.*, at p. 632 [whether "'the child would benefit from continuing the relationship'" with his or her parent is shaped by factors "such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs'"]; *In re Katherine J.* (2022) 75 Cal.App.5th 303, 317.)  Edwin did not appear at the section 366.26 hearing, and his counsel offered no evidence to support a finding the children actually benefited from occasional visits with their father, however pleasant they may have been.  To the contrary, the paternal uncle reported Aiden displayed concerning behaviors after visits and also when Edwin cancelled visits.  Roniel also reported Edwin had difficulties responding to the children's emotional needs during their visits.

c.  *Detriment from termination of the relationship*

The final question is not simply how regularly and consistently Edwin visited the children or whether they enjoyed a

positive, beneficial relationship with him, but whether the benefits of stability and permanence through adoption by the paternal uncle and aunt—with whom the children had been living for most of the past three years and felt safe—was outweighed by the harm that would be caused by severing the children's relationship with Edwin.  As the Supreme Court in *Caden C.* cautioned, the legislative preference—the "norm"—is for adoption; the parental relationship exception, like the other exceptions to termination of parental rights, applies only in "'exceptional circumstances.'"  (*Caden C.*, *supra*, 11 Cal.5th at p. 631; accord, *In re Celine R.* (2003) 31 Cal.4th 45, 53.)

Here, the juvenile court, expressly applying the correct *Caden C.* analysis, concluded there was no evidence in the record that the children's relationship with Edwin outweighed the benefits of consistency and stability in the adoptive home of their paternal uncle and aunt.  Moreover, as the court explained, the prospective adoptive parents intended to allow the children to continue to visit with Edwin, so "the relationship will continue as it is.  But they will at the same time benefit from an adoptive home where they have parents who are consistent in their lives and able to provide for them."

Edwin disputes the court's determination, arguing a permanent plan of legal guardianship would better serve the children's interests.  He has not, however, demonstrated the court's finding was arbitrary or irrational.  To the contrary, in light of the minimal evidence that would support application of the parental relationship exception, that decision was well within the court's discretion.

## DISPOSITION

The juvenile court's March 8, 2022 order terminating parental rights is affirmed.

PERLUSS, P. J.

We concur:


SEGAL, J.


FEUER, J.